IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

Case No. 2:25-CR-00004-M

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ANTON MONTES VERNON,

    Defendant.

ORDER

    This matter comes before the court on Defendant's motion to suppress [DE 22]. The court held a hearing on Defendant's motion on May 6, 2025. DE 28 (Minute Entry). At the conclusion of that hearing, the court orally denied Defendant's motion, and indicated that a written order would follow. *See id.* Shortly thereafter, the court received notice that the United States had come into possession of additional evidence bearing on Defendant's motion, and Defendant moved to reopen his suppression hearing. DE 31; DE 36. The court held a second hearing on Defendant's motion on July 1, 2025. DE 40 (Minute Entry).

    Defendant's motion to suppress raises two related issues: (1) whether law enforcement had a reasonable articulable suspicion to stop and frisk Defendant pursuant to *Terry v. Ohio*, 392 U.S. 1, 30 (1968), and if so, (2) whether the conduct of law enforcement that led to the recovery of the firearm from Defendant's person comported with *Terry*. The court answers each of those questions in the affirmative. Accordingly, and for the reasons that follow, Defendant's motion to suppress is denied. This order memorializes the court's ruling from the bench.[1]

---

[1] The court incorporates by reference each of its oral findings of fact and conclusions of law from the May 6 and July 1 hearings.

1

## I. Factual Background

Defendant is charged in a single count Indictment with possession of a firearm as a felon in violation 18 U.S.C. § 922(g)(1). DE 1 at 1. The charge stems from an encounter with law enforcement on November 9, 2023.

The night of November 9, Lieutenant White of the Ahoskie Police Department ("Ahoskie PD") was conducting a saturation patrol as part of a multi-agency task force created to engage in major crimes and narcotics investigations. DE 32 at 8-9 (May 6 Hearing Transcript).[2] A saturation patrol, true to its name, involves saturating high-crime areas with law enforcement officers in an effort to interdict ongoing criminal activity. *See id.* at 10. The task force was comprised of Ahoskie PD, the Northampton County Sheriff's Office ("NCSO"), and the Herford County Sheriff's Office. *Id.* at 14.

At the time of the incident, Lt. White had been employed by Ahoskie PD for approximately 17 years. *Id.* at 8. Given that experience, he knew the area well and was familiar with which neighborhoods in Ahoskie generated the most criminal activity. *See id.* at 11. That evening, Lt. White was operating his unmarked police vehicle (a pickup truck); an officer from the NCSO was accompanying him on the patrol and sitting in the front passenger seat. *Id.* at 22-23.

Shortly after 9:20 p.m., Lt. White drove south down Troy Street in Ahoskie, in a neighborhood well known to local law enforcement. *Id.* at 9, 33. Lt. White testified that, over the years, Ahoskie PD has received many complaints from concerned citizens in that neighborhood regarding drug distribution activities, as well as "shots fired" calls. *Id.* at 45-46. And Lt. White was personally aware of multiple federal drug and gun cases that originated within a few blocks of where he was driving. *Id.* at 11-12.

---

[2] All facts are derived from hearing testimony that the court found credible and other documentary evidence admitted during those hearings.

2

Lt. White turned left from Troy Street onto Newsome Street and, because the front windows on his vehicle were lowered, detected the odor of marijuana in the air. *See id.* at 68. Newsome Street, shortly before it reaches a dead end, intersects with Hart Street, which is also a dead-end street. *Id.* at 12. Lt. White observed a vehicle parked on Hart St. near the intersection with Newsome Street, facing south towards the dead end of Hart Street, as reflected on the map below. *Id.* at 9.



As he drove east along Newsome Street, Lt. White saw three individuals standing on Hart Street next to the parked car. *Id.* Upon approach, he noticed hot ash fall to the ground from one of the individual's hands, suggesting that at least one member of the group was smoking marijuana. *Id.*; *see also id.* at 17. Lt. White pulled his vehicle up perpendicular behind the parked vehicle; his vehicle faced the dead end of Newsome Street. *Id.*; *see also id.* at 25.

Lt. White suspected the individuals were engaged in criminal activity. *Id.* at 17. Possession of marijuana is illegal in North Carolina. *Id.* And based on his training and experience, Lt. White testified that when law enforcement finds drugs, they often find guns as well. *Id.* at 18. Further, he was conducting patrol in a pocket of Ahoskie known for criminal activity. *See id.* at 45. In fact,

3

from where he parked his unmarked patrol vehicle, Lt. White could turn and point to two different homes where he had executed search warrants, including one that led to a seizure of a significant quantity of drugs and firearms in a federal case. *Id.* at 11-12, 47-48.[3]

Lt. White's chest-mounted body camera was activated, *id.* at 16, and the following facts largely come from the court's observation of that footage. Lt. White exits his vehicle with the other officer and encounters three individuals, two male, one female, standing on Hart Street next to the parked vehicle, which had one door open.[4] Defendant was one of the three individuals.

The other officer illuminates the group with his flashlight. Lt. White then turns around and returns to his vehicle to retrieve his own flashlight, while the other officer remains with the individuals. This task only takes a few seconds, and then Lt. White returns to the group.

Upon his return, Lt. White asks who has "the weed." The three individuals all deny that they are in possession of marijuana. But the other male individual (not Defendant) admits that they "just finished smoking a blunt."

At that point, Lt. White says: "You all don't have weed on you? I am going to check real quick, alright?" Audio from the body-worn camera footage captures two voices respond with some version of "sure" or "alright," but the video from the camera is not focused on Defendant at that time, so it is unclear whether he made one of the verbal responses. As Lt. White approaches the other male individual to begin a pat down, he states: "and you don't have any weapons or nothing on you neither?" One of the males responds in the negative, but the body-worn camera does not capture whether it was Defendant or the other male individual.

---

[3] The court specifically notes that, at the May 6 hearing, it was able to observe Lt. White's demeanor, voice inflection, tone, hesitation in responding to questions, facial features, and body language. Based on those contemporaneous observations, the court found Lt. White's testimony to be highly credible.

[4] Lt. White testified that, as he approached the group, the odor of "marijuana" became "stronger." DE 32 at 17.

4

Lt. White begins conducting a pat down of the other male individual. He is standing behind the individual, so his body-worn camera only shows the center of the individual's back. At the May 6 hearing, Lt. White testified that, as he began frisking the other male, Defendant took off a backpack and placed it on the ground, and then started to reach down for it. DE 32 at 9-10. This action is not captured on Lt. White's body-worn camera, but as Lt. White is frisking the other male, he states: "Don't dig in the bag man," to which a male voice responds from off-camera: "alright."

At the July 1 hearing, the United States presented the body-worn camera footage from the other officer present that evening, which it did not have in its possession at the time of the first suppression hearing. *See* DE 31 at 3. That footage clearly captures Lt. White's conduct during his interaction with Defendant.

With regard to Defendant and the backpack, the footage reveals that, as Lt. White is frisking the other male individual, Defendant quickly removes a backpack he is wearing and places it on the ground with his right hand, which is grasping the top of the backpack near its largest compartment. The court finds that Defendant did not "reach for" the backpack, but he did make a quick movement with the backpack in his right hand as Lt. White was frisking the other male individual, so it easily could have appeared to Lt. White that Defendant was reaching for the backpack, or that Defendant was about to reach into the backpack after removing it.

Lt. White finishes the pat down of the other male, and then turns to Defendant. Defendant does not say anything, but holds both arms up to his sides. Lt. White begins by sticking his hands directly into the front pocket of Defendant's sweatshirt, without frisking the outside of that pocket first. Lt. White examines the contents of that pocket with a flashlight and then returns them. Lt.

5

White then pats the outside of Defendant's right front pants pocket, reaches into the pocket, retrieves what looks like a cell phone, and then returns the item to Defendant's right pocket.

Lt. White then turns his attention to Defendant's left front pants pocket. Lt. White places his right hand flat on the outside of Defendant's left pocket. He then slides his hand up the length of Defendant's pocket.[5] At the May 6 hearing, Lt. White testified that, as his hand made contact with Defendant's left pocket and slid upwards, he could feel "the handle of a pistol." DE 32 at 10. As his hand reaches the opening of Defendant's pocket, Lt. White reaches in and retrieves a firearm. Defendant is arrested and taken into custody.

## II. The Motion

Defendant moves to suppress the firearm, as well as any statements Defendant made to law enforcement after he was arrested. DE 22 at 1. Defendant argues first that the warrantless search of Defendant's person violated the Fourth Amendment because Lt. White had not developed a reasonable suspicion that criminal activity was afoot and that Defendant might be armed and dangerous. *Id.* at 3. Second, Defendant argues that he never consented to the search, and instead acquiesced under color of authority. *Id.* at 3-4. Third, after reviewing the body-worn camera footage that the United States disclosed after the May 6 hearing, Defendant argues that Lt. White conducted a search of Defendant that exceeds the bounds of *Terry*.

The United States filed a response in opposition to Defendant's motion. DE 25. The United States argues that the odor of marijuana, the officer's training and experience, and Defendant's "suspicious behavior" collectively gave Lt. White reasonable suspicion to conduct a warrantless frisk. *Id.* at 6. The United States also argues that Defendant voluntarily consented to

---

[5] At the July 1 hearing, counsel for Defendant disputed that Lt. White frisked the outside of Defendant's left pocket, and instead contended that Lt. White only performed a "one second touch." After viewing the relevant footage multiple times, the court finds that description of events is not accurate.

6

the search, both verbally and by physical act. *Id.* at 7. Last, the United States maintains that Lt. White's frisk of Defendant's left pants pocket was consistent with *Terry*.

### III. Standards of Review

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV; *see also United States v. Smith*, No. 24-4014, 2025 WL 854700, at *1 (4th Cir. Mar. 19, 2025) ("The Fourth Amendment does not prohibit all searches and seizures, merely those that are unreasonable."). A search occurs when a government actor infringes upon a reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). "It is well settled . . . that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal ellipses and quotation marks omitted).

One of those exceptions finds its roots in *Terry v. Ohio*. Under *Terry*, a law enforcement officer is permitted to seize an individual and conduct "a reasonable search for weapons" when the officer "has reason to believe" that "criminal activity is afoot" and that "he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27-30. In those circumstances, "due weight must be given" to "specific reasonable inferences" that the officer draws "in light of his experience." *Id.* at 27. When a court reviews the officer's actions, it considers "the totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

Another exception involves consent. "A police officer may conduct a search of an area without a warrant and without probable cause if the person in control of the area voluntarily consents to a search." *United States v. Smith*, 30 F.3d 568, 571 (4th Cir. 1994). "A defendant need not give consent verbally for there to be valid consent," and may give consent by engaging

7

in a physical "act that affirmatively facilitates the search." *United States v. Woodland*, 285 F. Supp. 3d 864, 874 (D. Md. 2018). But consent cannot be shown by mere "acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968). Like a *Terry* search, voluntariness of consent "is to be determined by the totality of all the circumstances." *United States v. Mendenhall*, 446 U.S. 544, 557 (1980).

A defendant who believes he has been subjected to an unreasonable search may move to suppress the evidence seized during that search. *See* Fed. R. Crim. P. 12(b)(3)(C). In moving to suppress evidence, the initial "burden of proof" falls "upon the defendant." *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). But "[o]nce the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *United States v. Gualtero*, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014); *see also United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

## IV. Analysis

Because it is undisputed that Defendant was subject to a warrantless search, the court concludes that he has met his initial burden of proof. *Schneckloth*, 412 U.S. at 219; *Dickerson*, 655 F.2d at 561. But after considering the totality of the circumstances, the court finds that the United States has met its burden, by a preponderance of the evidence, in demonstrating that Lt. White conducted a lawful *Terry* frisk of Defendant's left pants pocket, in which the firearm was found. *Sokolow*, 490 U.S. at 8; *Matlock*, 415 U.S. at 178 n.14; *Gualtero*, 62 F. Supp. 3d at 482. Several points underlie this latter conclusion.

### a. Basis for Stop and Frisk

First, Lt. White reasonably suspected that criminal activity was afoot; the frisk occurred during an ongoing investigation into marijuana possession. *Terry*, 392 U.S. at 30. Lt. White

8

testified that he could smell marijuana as he was driving down Newsome Street, saw hot ash fall from an individual's hand as his vehicle approached the intersection with Hart Street, and discerned the odor of marijuana become stronger as he left his vehicle and approached Defendant. DE 32 at 9, 17, 68. The court found that testimony credible. Further, when Lt. White asked who had "the weed," one member of the group admitted that they "just finished smoking a blunt." Frankly, that admission, coupled with Lt. White's observations, makes the evidence of marijuana use and/or possession overwhelming.[6]

Because possession of marijuana is a crime in North Carolina, Lt. White was authorized to investigate further. *See* N.C.G.S. § 90-9(d)(4). Additionally, "the odor of marijuana . . . on a suspect raises concern for officers that a defendant may act in an unpredictable and dangerous manner" and is "properly considered . . . as a factor supporting reasonable suspicion to frisk." *United States v. Colbert*, 54 F.4th 521, 528 (7th Cir. 2022); *see also United States v. Cartwright*, 183 F. Supp. 3d 1348, 1356 (M.D. Ga. 2016) (holding that "smell of marijuana" on defendant contributed to officer's reasonable suspicion to "conduct a pat down" of defendant).

Second, the odor of marijuana reasonably supported Lt. White's suspicion that he might be "dealing with an armed and dangerous individual," *Terry*, 392 U.S. at 27, due to "the unfortunate reality that drugs and guns all too often go hand in hand," *United States v. Lomax*, 293 F.3d 701, 706 (4th Cir. 2002). As the Fourth Circuit has frequently "noted, where there are drugs, there are almost always guns." *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997). And Lt. White expressly testified to that effect during the May 6 hearing. He stated that, based on his "training and experience and working drugs for the last approximately 10 or 15 years," he has learned that

---

[6] At the July 1 hearing, Defendant's cousin (the female individual standing in the group) testified that she could not "smell the odor of marijuana" when Lt. White arrived on the scene. DE 32 at 60. In light of Lt. White's testimony and the body-worn camera footage to the contrary, the court finds this testimony to be non-credible.

9

"guns and drugs go together." DE 32 at 10. The court must give "due weight" to this "specific" and "reasonable inference[]" that Lt. White drew "in light of his experience." *Terry*, 392 U.S. at 27.

Third, the location and timing of the search further supports Lt. White's limited *Terry* frisk. Lt. White, at the time of the incident, was conducting a nighttime saturation patrol as part of a multi-agency task force specifically created to interdict major crimes and narcotics distribution in certain areas of Ahoskie, including this particular neighborhood. DE 32 at 8-9, 14-15, 44-45. In other words, the encounter occurred in a neighborhood "that had been targeted for special enforcement by the City of [Ahoskie]." *United States v. Mayo*, 361 F.3d 802, 807 (4th Cir. 2004).

Lt. White testified that Ahoskie PD had received numerous "shots fired" calls and other complaints over the years from residents concerning drug distribution activities in the neighborhood. DE 32 at 10-11, 41-42, 46. And, from where Lt. White parked his vehicle at the intersection of Newsome and Hart Streets, he could turn and point to two homes where he had previously executed search warrants, one of which led to the recovery of firearms and drugs in a federal case. *See id.* at 47-48.[7] Thus, the incident took place in a "high crime area[], where the possibility that any given individual is armed is significant." *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990).

---

[7] At the May 6 hearing, Defendant presented evidence that, for the 12 month-period preceding the incident, Hertford County had not received any 911 calls concerning drugs or violence that referenced either 1020 Newsome Street or 1100 Newsome Street, the two homes on either side of Hart Street where the vehicle was parked. And at the July 1 hearing, Defendant presented Call Automated Dispatch ("CAD") reports for the same period which reflected that there were no 911 calls related to drugs or violence for any address on Newsome Street. But the court does not find this hyper-localized and time-limited evidence particularly persuasive, especially considering Lt. White's testimony that he could see multiple homes where he had conducted searches from where he parked his vehicle. Further, Lt. White testified that Ahoskie PD receives "complaints that aren't documented in CAD," DE 32 at 12, and also specifically mentioned Alton Street, Baker Street, and Troy Street during his testimony, *id.* at 13, 41-42. Defendant did not offer any evidence to rebut that testimony.

10

Where an "encounter t[akes] place at night in a high-crime area," that "is a relevant factor in the totality of the circumstances analysis." *United States v. Cloud*, 994 F.3d 233, 248 (4th Cir. 2021). Lt. White was "not required to ignore the relevant characteristics of" this Ahoskie neighborhood "in determining whether the circumstances [we]re sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Quite the opposite: "an area's propensity toward criminal activity is something that an officer may consider." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). It "is an articulable fact." *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977); *see also United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) (holding that district courts "may properly consider the criminal propensity of the patrolman's beat").

Fourth, as Lt. White was conducting a pat down of the other male, Defendant quickly removed his backpack and placed it on the ground, with his right hand grasping the backpack near its largest compartment. That movement gave Lt. White the impression that Defendant was reaching for something in the backpack and prompted him to instruct Defendant to not "dig in the bag man." When a suspect makes "suspicious movements," those movements may "be taken to suggest that the suspect may have a weapon." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013). Here, Defendant's movement "created an opportunity for" him "to reach for a weapon," and is an additional articulable fact that reinforces the reasonableness of Lt. White's suspicion that Defendant might be armed and dangerous. *Id.* at 301. Moreover, Lt. White's instruction to Defendant to stop reaching for the backpack corroborates his later testimony that, during the encounter, he was concerned that one or more of the individuals could be armed and dangerous. DE 32 at 20.

11

Last, this encounter involved suspected marijuana possession that occurred immediately adjacent to the open door of a vehicle that was parked on a public street. And when an "officer has a reasonable suspicion that illegal drugs are in [a] vehicle, the officer may . . . order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others." *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998). Although this incident does not involve a true traffic stop, the court reiterates its conclusion from the first suppression hearing that the unique dangers present to law enforcement during traffic stops are indistinguishable from those here.

"[R]oadside encounters between police and suspects are especially hazardous." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam). Hazards associated with roadside encounters include driver or passenger access to compartments in the vehicle, flight, and other traffic. *Arizona v. Johnson*, 555 U.S. 323, 331–32 (2009); *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). Those risks are present irrespective of whether an officer has pulled over a vehicle with three occupants, or the officer is standing in the road next to three individuals and a vehicle with one of its doors open. At a minimum, the similarity between this incident and the typical traffic stop is relevant to the *Terry* analysis and bears on the reasonableness of Lt. White's actions that night. *See Sakyi*, 160 F.3d at 169-70; *see also United States v. Jones*, 289 F. App'x 593, 597 (4th Cir. 2008) ("Because guns often accompany drugs, when an officer suspects the presence of drugs in a stopped vehicle, the risk of danger to the officer is apparent."). In both cases, "[t]he risk of harm to" everyone involved "is minimized if the officers routinely exercise unquestioned command of the situation." *Wilson*, 519 U.S. at 414 (citing *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)).

12

At bottom, the Fourth Amendment demands reasonableness, not perfection. And it is "unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. Here, Lt. White possessed a reasonable articulable suspicion that criminal activity was afoot, and that Defendant was armed and dangerous. The totality of relevant circumstances include: (1) that the incident involved an investigation into marijuana possession, (2) Lt. White's experience that drugs and guns often go together, (3) the timing and location of the search, i.e., a nighttime saturation patrol in a high-crime area of Ahoskie that occurred as part of a multi-agency task force dedicated to major crimes and narcotics distribution, (4) Defendant's suspicious movement with his backpack while Lt. White was frisking his companion, and (5) the similarities between this incident and a traffic stop. Like in other cases where the Fourth Circuit has approved of a limited stop and frisk, here "[t]he hour was late, the street was dark, the officer[s were outnumbered], and the suspected crime was" one "that often involves [possession] of weapons." *Moore*, 817 F.2d at 1108; *see also Stanfield*, 109 F.3d at 984. Based on "the totality of the circumstances," the court finds that a limited frisk of Defendant's person was reasonable. *Sokolow*, 490 U.S. at 8.[8]

    b. <u>Scope of Frisk</u>

Defendant maintains that, even if Lt. White was authorized to conduct a *frisk* of Defendant pursuant to *Terry* (which Defendant does not concede), Lt. White nonetheless exceeded the scope of *Terry* and conducted an unlawful *search* of Defendant. To recount the relevant facts, Lt. White began by sticking his hands directly into the front pocket of Defendant's sweatshirt, without

---

[8] After reviewing the body-worn camera footage, the court does not find that Defendant voluntarily consented to the search. The footage does not establish that Defendant verbally consented to the search, and he raised his arms under circumstances where resisting law enforcement would have been unwise. Given the totality of the circumstances, his actions reflect acquiescence to a claim of lawful authority. *See Bumper*, 391 U.S. at 549.

13

frisking the outside of that pocket first. Lt. White then patted the outside of Defendant's right front pants pocket, and then reached into that pocket.

Lt. White then turned his attention to Defendant's left front pants pocket, placing his right hand flat on the outside of Defendant's left pocket and sliding his hand up the length of Defendant's pocket. Lt. White testified that, as his hand made contact with Defendant's left pocket and slid upwards, he could feel "the handle of a pistol." DE 32 at 10. As his hand reached the opening of Defendant's pocket, Lt. White reached in and retrieved a firearm.

"Immediately reaching into a subject's pocket during a frisk is unreasonable because it goes beyond the scope of *Terry*." *United States v. Chase*, No. 23-CR-0296, 2025 WL 934511, at *8 (D. Md. Mar. 27, 2025). But even assuming that Lt. White's search of Defendant's sweatshirt pocket exceeded the scope of *Terry*,[9] that act does not taint the recovery of the firearm, which was immediately preceded by a lawful *Terry* frisk of Defendant's left pants pocket.

---

[9] At the July 1 hearing, the court asked the United States for its position on whether the search of Defendant's sweatshirt pocket was a lawful search incident to arrest based on probable cause that Defendant possessed marijuana. The United States acknowledged that Lt. White's search of the sweatshirt pocket exceeded the scope of *Terry*, but indicated that the search of the sweatshirt pocket could nonetheless be considered a lawful search incident to arrest. However, the United States stated that it was not basing its argument on that theory because, even if Lt. White's search of Defendant's sweatshirt pocket was unlawful, his frisk of Defendant's left pants pocket was lawful. Defendant maintained that the search of the of the sweatshirt pocket was unlawful because Lt. White could not have arrested Defendant for possession of marijuana under the circumstances.

Given the respective position of the parties, the court will proceed in its analysis from the premise that the search of the sweatshirt pocket exceeded the scope of *Terry*. But the court harbors significant doubt that there was any primary illegality in that search. Based on the odor of marijuana and the other male individual's admission that they "just finished smoking a blunt," Lt. White had probable cause to arrest Defendant for possession of marijuana. *See, e.g., United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) (concluding that particularized odor of marijuana provides probable cause to arrest where marijuana possession is a crime); *United States v. Radcliffe*, 757 F. App'x 250, 252–53 (4th Cir. 2018) (same); *State v. Massenburg*, 66 N.C. App. 127, 129, 310 S.E.2d 619, 621 (1984) (holding that law enforcement "had probable cause to arrest the defendant" and conduct search incident to arrest after they "approach[ed his] automobile" in a public parking lot "and smell[ed] marijuana"); *cf. State v. Springs*, 292 N.C. App. 207, 215–16, 897 S.E.2d 30, 37 (2024) (even after legalization of hemp, officer possessed probable cause to search vehicle where officer detected odor of marijuana and defendant admitted to recently smoking marijuana and "made no assertion at the time the odor derived from legalized hemp").

The court acknowledges that at least one district court in the Fourth Circuit has suggested in dicta that a search incident to arrest is only lawful if the officer possesses contemporaneous subjective intent to arrest. *See United States v. Brandon*, No. 22-CR-0239, 2023 WL 6961937, at *27 n.19 (D. Md. Oct. 19, 2023). And the United States did not offer any evidence of Lt. White's intent to arrest Defendant for possession of marijuana. But, in other relevant

14

The rule "that evidence seized during an unlawful search" may not be used as "proof against the victim of the search . . . extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Such products are referred to as "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341 (1939). But to constitute fruit of the poisonous tree, the evidence must be derived from an illegal search, and not "an independent, untainted source." *United States v. Seldon*, 479 F.3d 340, 344 (4th Cir. 2007).

The Supreme Court has made "clear that evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Segura v. United States*, 468 U.S. 796, 815 (1984). In other words, "the challenged evidence" must be "in some sense the product of illegal governmental activity." *United States v. Crews*, 445 U.S. 463, 471 (1980). Thus, "if police discover the evidence from a[] source independent from the illegal conduct, the evidence need not be excluded." *United States v. Harris*, 175 F.3d 1017 (Table), 1999 WL 133134 at *2 (4th Cir. 1999).

Here, Lt. White's search of Defendant's sweatshirt pocket was not "the 'but for' cause of the discovery of the [firearm]." *Segura*, 468 U.S. at 815. The firearm was not recovered from the sweatshirt pocket. Put another way, the firearm that Lt. White recovered from Defendant's left pants pocket was not "the product of" any "illegal governmental activity." *Crews*, 445 U.S. at 471. Because the firearm does not constitute "fruit" of any "poisonous tree," *Nardone*, 308 U.S. at 341, "there is no nexus sufficient to provide a taint and the evidence is admissible," *Nix v. Williams*, 467 U.S. 431, 448 (1984).

---

contexts, the Supreme Court has advised against assessing the constitutionality of a search or seizure based "on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer." *New York v. Quarles*, 467 U.S. 649, 656 (1984); *see also id.* at n.6 (collecting cases). Ultimately, the court does not need to reach this issue because it will proceed from the premise that Lt. White's search of Defendant's sweatshirt pocket exceeded the scope of *Terry*.

15

The court further finds that Lt. White's frisk of Defendant's left pants pocket was lawful. *Terry* permits "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65 (1968). If that limited patting reveals "an object whose contour or mass makes its identity immediately apparent as contraband, that object may be lawfully seized." *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022) (internal brackets omitted).

That is precisely what transpired here. Body-worn camera footage reflects that Lt. White placed his right hand flat on the outside of Defendant's left pocket and slid his hand up the length of Defendant's pocket. Lt. White testified that, as his hand made contact with Defendant's left pocket and slid upwards, he could feel "the handle of a pistol." DE 32 at 10. Lt. White then reached into the pocket and retrieved the firearm. Thus, Lt. White conducted "a limited patting of" Defendant's "outer clothing," and specifically his left pants pocket. *Sibron*, 392 U.S. at 65. That limited patting revealed "an object" that was "immediately apparent as contraband," permitting "that object" to "be lawfully seized." *Gist-Davis*, 41 F.4th at 264. Lt. White's frisk of Defendant's left pants pocket, the but-for cause of the recovery of the disputed evidence, falls well within the confines of *Terry*.

The exclusionary rule is a judge-made doctrine, the "prime purpose" of which "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). In that regard, "[t]he rule is calculated to prevent, not to repair." *Elkins v. United States*, 364 U.S. 206, 217 (1960). The rule does not repair because, when it applies, "[t]he criminal is" permitted "to go free" solely "because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21 (1926) (Cardozo, J.). And to further the preventative purpose of the rule, "police conduct must be

16

sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). The court finds that Lt. White's relevant conduct was lawful; accordingly, "[t]he deterrent objective of the exclusionary rule" would "not [be] advanced" under the circumstances of this case. *United States v. May*, 747 F. Supp. 3d 832, 844–45 (E.D.N.C. 2024).

### V. Conclusion

Because the United States has met its burden by a preponderance of the evidence, Defendant's motion to suppress is DENIED.

SO ORDERED this ___3d___ day of July, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE